1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )          Case No. 2:13-cr-00189-KJD-CWH
                                   )
vs.                                )          **FINDINGS AND**
                                   )          **RECOMMENDATION**
FRANCISCO ALCARAZ,                 )
                                   )
                    Defendant.     )
_____)

This matter is before the Court on Defendant Francisco Alcaraz's Motion to Suppress (#43), filed on December 18, 2013.  The Court also considered the Government's Response (#51), filed on January 27, 2014, and Defendant's Reply (#56), filed on February 4, 2014.  The Court conducted an evidentiary hearing on March 17, 2014 (#72) in which the Court admitted thirteen exhibits from Defendant and two exhibits from the Government.  (Evid. Hr'g Mar. 17, 2014, Def.'s Exs D 1-11 and E1-2 and Govt.'s Exs 2-3.)  In addition, the Court considered Defendant's Supplemental Brief (#76), filed on March 31, 2014 and the Government's Response (#77) filed on April 7, 2014.

**BACKGROUND**

On August 7, 2013, a Federal Grand Jury returned a superseding criminal indictment, charging Defendant Francisco Alcaraz ("Defendant") with three separate counts of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2).  *See* Superseding Indictment #20.  Count One alleges that Defendant possessed a firearm on November 17, 2012.  Count Two alleges that Defendant possessed a firearm on February 16, 2013.  A summary of the Court's findings related to Count One and Count Two will follow.

    **A.**    **Count One: November 17, 2012**

On November 17, 2012, at approximately 11:56 p.m., Las Vegas Metropolitan Police

1    Department (LVMPD) Officer Santino Dewreede ("Officer Dewreede") and two other officers

2    responded to a report of a fight involving an individual armed with a firearm at an apartment at 217

3    N. 9th Street, Las Vegas, Nevada.  Upon arrival, the officers noticed what appeared to be fresh

4    blood outside the door to Apartment #5.  They knocked on the door and made contact with the

5    female tenant, Fawn Rensink, who provided her consent for the officers to enter apartment.  In

6    order to prevent further fighting, and because a firearm was allegedly involved, a protective sweep

7    of the apartment was conducted and Defendant, along with two other males, one of whom was

8    naked, bleeding, and hysterical, were detained pending further investigation.  The tenant provided

9    consent to search her apartment for firearms.  During the search, officers located a firearm inside of

10   a locked hall closet.  The tenant advised that she did not own a firearm and that there should not be

11   a firearm in her closet.

12       Defendant and the Government dispute what happened next.  Defendant was detained by

13   Officer Dewreede in the apartment kitchen and later escorted outside of the apartment to await the

14   arrival of LVMPD's Firearms Investigations Unit ("FIU"), which had been called to assist in the

15   investigation.  Officer Dewreede did not advise Defendant of his *Miranda* rights.  Further, Officer

16   Dewreede testified that, while in the kitchen, Defendant spontaneously volunteered that he wanted

17   a lawyer and did not want to talk about the incident.

18       While waiting for the Investigator from the FIU to arrive, Defendant and Officer Dewreede

19   engaged in casual conversation.  Defendant began to talk about recently getting out of prison and

20   indicated that he knew that he had "messed up" by coming over to the apartment.  When they were

21   talking, Defendant said nothing about wanting a lawyer.  Officer Dewreede testified that he did not

22   ask any questions about the fight or the firearm initially.  He testified that only later did he ask how

23   Defendant knew the tenant of Apartment #5 and the man who had been bleeding.  Officer

24   Dewreede testified that Defendant indicated that when he saw the fight, he found the firearm in the

25   parking lot, and took it.  In contrast, Defendant testified that he did not make any statements

26   regarding the incident to Officer Dewreede and simply told him that he wanted a lawyer.

27       Upon FIU Detective Robert Orth's ("Detective Orth") arrival, he was briefed by the officers

28   on the scene and took control of the investigation.  After the briefing, Detective Orth entered the

2

apartment and seized the firearm.  Officer Dewreede did not recall whether he told Detective Orth that Defendant had previously indicated that he wanted a lawyer.  Similarly, Detective Orth did not recall that Officer Dewreede told him anything about Defendant's statements to Officer Dewreede regarding the incident.  Detective Orth testified that he did not know that Defendant said to Officer Dewreede that he did not want to talk and he wanted a lawyer.  Further, Detective Orth indicated that it is his expectation that such information would be provided to him during the initial briefing when he arrived at the crime scene.

Detective Orth testified that he advised Defendant of his *Miranda* rights by reading from a LVMPD issued card.  (Evid. Hr'g Mar. 17, 2014, Govt. Ex. 3 Copy of Advisement for Custodial Interrogation.)  Defendant indicated that he understood his rights, agreed to speak with him, and did not state that he wanted to remain silent or have a lawyer.  Then, Detective Orth obtained a statement from Defendant in which Defendant admitted that he possessed the firearm and placed it in the apartment closet.  Defendant further stated that his DNA and fingerprints would likely be on the firearm.  Detective Orth testified that he obtained a DNA sample from Defendant after obtaining written consent from Defendant.  (Evid. Hr'g Mar. 17, 2014, Govt. Ex. 2 DNA Collection Form.)

In contrast, Defendant testified that he asked for a lawyer when he was detained by Officer Dewreede at least one hour before Detective Orth arrived.  Defendant further testified that he overheard Officer Dewreede tell Detective Orth that Defendant had "lawyered up."  Also, Defendant testified that after Officer Dewreede told Defendant that the detectives arrived, Defendant again indicated that he wanted a lawyer and did not want to talk.  Defendant testified that Detective Orth told him that he would be let go if Defendant explained what happened and said "help me, help you."  Defendant also testified that he made a statement because he thought he would be let go.  Defendant testified that only after making a statement, in which he explained his involvement in the incident, was he given his *Miranda* rights and asked to consent to a DNA swab. Defendant agreed to provide the DNA swab because he was told that he would be let go.  He testified that he did not read the consent form for the swab seizure prior to signing because he was cooperating in order to be released.

By way of the instant motion, Defendant requests two forms of relief as to Count One: that the Court suppress (1) all of Defendant's statements made to law enforcement officers on November 17, 2012 and (2) the DNA buccal swab, for violation of the Fifth Amendment.  In response, the Government contends that Defendant's statements are not subject to suppression under the Fifth Amendment because Defendant received and waived his *Miranda* rights and he voluntarily consented to the buccal swab seizure.

### B.   Count Two: February 16, 2013

On February 16, 2013, at approximately 9:47 p.m., LVMPD Officers Steven Corry ("Officer Corry") and Kelly Cannon ("Officer Cannon") were operating as a marked unit in the area of Charleston Boulevard and Main Street in Las Vegas, Nevada.  The officers observed a red Honda Accord driving eastbound on Charleston Boulevard.  They conducted a police records check of the license plate and learned that the registered owner, Melissa Pratti ("Pratti"), had an active warrant for her arrest.  By the time the officers received the records check results, the vehicle had turned northbound onto 4th Street.  The officers located the vehicle in the AM/PM parking lot at 333 East Charleston Boulevard.  They entered the well-lit parking lot and pulled in behind the vehicle, which was parked at the gas pump.  Before the officers activated any emergency lights or siren, Defendant exited the driver's seat and asked why he was being stopped.

The officers asked Defendant to step in front of their vehicle, patted him down,[1] and advised him that he was being stopped due to an outstanding warrant for the owner of the vehicle.  Then, the officers obtained Defendant's drivers license.  Defendant advised the officers that a female was also inside of the vehicle, but it was not Pratti.  The officers contacted the passenger who identified herself as Heather Aguilera ("Aguilera").  Defendant told the officers that the vehicle did not belong to him, but belonged to his friend, Pratti.  The officers conducted a police records check of both Defendant and Aguilera.  They learned that Defendant was a convicted felon for various violent offenses and had several arrests for possession of a stolen vehicle.  Aguilera had

---

[1] Officer Corry testified that it is his standard practice to pat down individuals who exit a vehicle during a traffic stop.

4

1  no notable criminal history.  Further, the vehicle had not been reported stolen.  Officer Corry

2  requested the telephone number for Pratti, the owner of the vehicle, and attempted to call her, but

3  was unable to reach her at the number provided.  Then, Officer Corry asked Defendant if the

4  vehicle had insurance and was told that it did and the documents were inside of the glove box.

5  Officer Corry testified that a dash cam recorded this incident, but he did not recall what happened

6  to the footage.[2]

7        Defendant and the Government dispute what happened next.  Officer Corry testified that he

8  asked for and received consent from Defendant to retrieve the registration and insurance documents

9  from the glove box.  He testified that, for officer safety purposes, he would not have allowed

10  Defendant to return to the vehicle to obtain the insurance information.  More specifically, Officer

11  Corry was concerned because he knew that Defendant was a convicted felon, he was unable to

12  contact the owner of the vehicle to determine whether Defendant had permission to drive the

13  vehicle, and he did not know what was in the vehicle.  While leaning into the vehicle to retrieve

14  documents from the glove box, Officer Corry observed the barrel of a black semi-auto firearm

15  under the passenger front seat.  He recognized the firearm due to his training and experience.

16  Because Defendant was known to be a convicted felon, Officer Corry immediately stopped his

17  quest for the insurance documents and told his partner "413."  This code alerted Officer Cannon as

18  to the presence of a firearm and they took Defendant into custody, and explained to him his

19  *Miranda* rights.  Similarly, Officer Cannon testified that she heard Defendant consent to Officer

20  Cannon's request to look for the insurance documents in the glove box and that soon thereafter

21  Officer Corry indicated "413."

22        LVMPD FIU was contacted and Detective Orth responded.  While waiting for Detective

23  Orth, Officer Cannon spoke with Aguilera who informed her that she met Defendant earlier that

24  evening.  Officer Cannon testified that Aguilera told her that she observed Defendant show a black

25  firearm to an unknown black male earlier that evening, that Defendant told her it was a BB gun, but

26

27        [2] The Government claims that the dash camera and recordings were returned to the
   private company who provided it on a test basis and therefore, are not in the custody of the
28  Government.

1    she recognized it as an actual firearm.  Aguilera completed a voluntary statement and consented to

2    a DNA buccal swab seizure.  Upon arriving, Detective Orth received a briefing from Officers Corry

3    and Cannon and applied for and received a search warrant.  (Evid. Hr'g Mar. 17, 2014, Def.'s Exs.

4    E1-2 Duplicate Original Search Warrant.)  Upon its execution, he recovered a Beretta 9mm semi-

5    auto pistol from under the passenger front seat.[3]  (Evid. Hr'g Mar. 17, 2014, Def.'s Exs D1-11

6    Photographs.)  Detective Orth spoke with Defendant who confirmed that he had been advised of his

7    *Miranda* rights earlier by Officer Corry and understood his rights.  Further, Defendant made a

8    statement to Detective Orth denying possession of the firearm.

9          In contrast, Defendant testified that he did not give permission to retrieve the insurance

10   documents from the glove compartment or to search the vehicle.  He further testified that he asked

11   the officers to call Pratti to find out about the insurance and ownership of the vehicle.  Defendant

12   also testified that the officers made no efforts to contact Pratti.  Further, Defendant indicated that he

13   told the officers to not search the car, but that the officers searched it twice.[4]  Defendant testified

14   that he was not aware that there was a weapon in the vehicle.

15         Pratti testified that she had been previously contacted by LVMPD to determine if Defendant

16   had permission to drive her vehicle.  At that time, Pratti confirmed that Defendant did have

17   permission.  Pratti testified that she did not receive a call on February 16, 2013 to confirm that

18   Defendant had permission to drive her vehicle.  She testified that her phone number was

19   functioning properly, had not changed from the number Defendant provided to the officers, and

20   was not disconnected on February 16, 2013.

21         By way of the instant motion, Defendant requests two forms of relief as to Count Two: that

22   the Court suppress (1) all physical evidence including the firearm and narcotics/paraphernalia and

23

24         [3] Detective Orth also recovered ammunition, two pipes, and a clear plastic bag with a

25   white substance that he believed to be methamphetamine.

26         [4] Defendant also denied that he knew Aguilera.  He agreed that there was a female in the

27   car with him, but testified that it was not Aguilera.  The Government noted that the female he
     claimed was in the car with him has a connection to another defendant housed in the same unit as

28   Defendant.

(2) all of the statements from Defendant and Aguilera obtained on February 16, 2013, for violation of the Fourth Amendment.  In response, the Government argues that suppression of evidence from the February 16, 2013 investigatory stop is not warranted under the Fourth Amendment due to standing and consent issues.

## DISCUSSION

### A.    Count One: November 17, 2012

In his motion, Defendant argues that any statements he made on November 17, 2012 and the DNA buccal swab obtained should be suppressed for violation of the Fifth Amendment.  Specifically, Defendant contends that he did not waive his *Miranda* rights.  Indeed, Defendant claims that he told Officer Dewreede that he was invoking his right to remain silent and to counsel.  Further, Defendant highlights the fact that the Government obtained a written consent for the DNA buccal swab, but no written waiver of his *Miranda* rights.

In contrast, the Government responds that Defendant knowingly waived his *Miranda* rights and voluntarily provided a statement.  The Government notes that there is no requirement that the *Miranda* rights be provided to Defendant in written form.  Further, the Government alleges that Defendant testified to requesting an attorney before he was subjected to interrogation, custodial or otherwise, and under arrest.  The Government underscores the fact that Detective Orth read Defendant his *Miranda* rights and Defendant did not exercise them at that time.  Additionally, the Government contends that Defendant voluntarily consented to the DNA buccal swap seizure.

### 1.    Administering *Miranda*

The obligation to administer *Miranda* warnings attaches once a person is subject to "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).  "Custody" turns on whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (*citing United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002)).  In addition to being in custody, the accused must also be subject to interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  Not every question asked in a custodial setting constitutes interrogation.  *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006) (*citing U.S. v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).  Interrogation means

7

questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. 291 at 301.

Defendant argues that when he told Officer Dewreede that he wanted a lawyer and did not want to talk, he invoked his right to remain silent.  Therefore, Defendant alleges that any questioning by Officer Dewreede or Detective Orth thereafter violated the Fifth Amendment.  The Government argues that Defendant was not in custody at the time, he was merely being detained in the kitchen of the apartment, and therefore, there was no obligation to provide *Miranda* warnings to Defendant.

### 2.   Custody

To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994).  The inquiry focuses on the objective circumstances of the interrogation rather than the subjective views of the officers or the individual being questioned. *Id.* at 323.  The court must determine whether "the officers established a setting from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987), *modified by* 830 F.2d 127 (9th Cir. 1987); *see also United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001).

Here, Officer Dewreede testified that Defendant was not free to leave.  In fact, Defendant was placed in handcuffs, taken from the kitchen to the area outside of the apartment, and required to wait until FIU Detective Orth arrived at the scene.  Defendant testified that at least an hour passed while he waited.  Therefore, the Court finds that a reasonable person would not have believed that he was free to leave and Defendant was in custody.

### 3.   Interrogation

Interrogation means questioning or "its functional equivalent," including "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446

U.S. 291 at 301.  An "incriminating response" is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial.  *Id.* at 302.  Whether the questioning constitutes an interrogation is an objective test that focuses on the perception of the defendant; the officer's subjective intent in asking the questions is relevant, but not determinative.  *See, e.g., United States v. LaPierre*, 998 F.2d 1460, fn.6 (9th Cir. 1993); *Innis*, 446 U.S. at 301-02; *Booth*, 669 F.2d at 1238 (finding the test to be an objective one where the subjective intent of police is relevant, but not conclusive).  Accordingly, volunteered statements are not barred by the Fifth Amendment.  *Miranda*, 384 U.S. at 478.

Here, Officer Dewreede testified that he asked Defendant how he knew the tenant and the bleeding man.  In doing so, Officer Dewreede engaged in conversation with Defendant regarding facts that were important to the investigation of the fight and the possession of the weapon.  The Court finds that these questions were related to the charged crime and reasonably likely to elicit an incriminating response.  *See Booth*, 669 F.2d at 1238 (degree to which questions are routine or involve matters unrelated to the crime are important factors).  Defendant testified that he made no statements of any kind to Officer Dewreede.  After carefully observing the demeanor of the witnesses and evaluating their candor and manner of testifying, the Court finds the statement of Officer Dewreede to be more credible.  Officer Dewreede testified that he did not provide *Miranda* warnings to Defendant, but, nevertheless, asked Defendant general questions.  Further, Office Dewreede testified that he received specific answers about the incident from Defendant.  After careful consideration, the Court finds that Defendant's statements to Officer Dewreede should be suppressed because Defendant was subjected to a custodial interrogation by Officer Dewreede in violation of his *Miranda* rights.  Therefore, the Court will recommend the suppression of Defendant's statements to Officer Dewreede that he had "messed up" by coming over the apartment and he found the firearm in the parking lot during a fight and took it.

### 4.      Miranda Warning Sufficiency

Detective Orth arrived after Defendant's statements were made to Officer Dewreede.  After being briefed regarding the incident, Detective Orth approached Defendant and advised him of his *Miranda* rights from a card, which he routinely uses to provide such advice.  (Evid. Hr'g Mar. 17,

1  2014, Govt. Ex. 3 Copy of Advisement for Custodial Interrogation.)  Detective Orth testified that

2  Defendant agreed to speak with him and did not indicate that he wanted a lawyer or to remain

3  silent.  Thereafter, Detective Orth obtained an incriminating statement from Defendant, that is, how

4  he came into possession of the firearm.  In contrast, Defendant denies that he was advised of his

5  *Miranda* right until after he admitted that he possessed the firearm.  Therefore, there is a dispute as

6  to the timing of the *Miranda* warning.

7  First, the Court will address the credibility issue.  Detective Orth recounted his customary

8  practice of using a *Miranda* card to explain the rights to a defendant prior to interrogating him.

9  Further, Detective Orth recollected that he followed the same procedure on November 17, 2012 by

10  reading Defendant his rights from Detective Orth's *Miranda* card.  (Evid. Hr'g Mar. 17, 2014,

11  Govt. Ex. 3 Copy of Advisement for Custodial Interrogation.)  After carefully observing the

12  demeanor of the witnesses and evaluating their candor and manner of testifying, the Court finds

13  Detective Orth more credible.  His demeanor was earnest and straightforward and he appeared at all

14  times to answer questions based on a truthful recall of events.  Defendant did not appear to have the

15  same demeanor, but rather appeared to be testifying in a manner that he believed would be most

16  beneficial to himself.[5]  Therefore, the Court finds that Defendant was administered the *Miranda*

17  warnings prior to his interrogation by Detective Orth.[6]

18  Second, the Court will address the issue of whether the *Miranda* warnings given to

19  Defendant were sufficient, in light of Defendant's previous request for a lawyer, and having made

20  statements to Officer Dewreede.  Neither party briefed this issue, but the Court finds it necessary to

21  fully consider it.  In *Oregon v. Elstad*, 470 U.S. 298, 301 (1985), the Supreme Court considered the

22  admissibility of a confession obtained after a proper *Miranda* warning, but preceded by the

23  suspect's earlier, unwarned, incriminating statements.  The Supreme Court reasoned that "absent

24  

25       [5] The Court notes that Fed R. Evid. 609 allows for a conviction of a felony as
26  impeachment of a witness's character for truthfulness.

27       [6] Defendant also argued that the Government failed to explain the absence of a written
28  waiver of *Miranda* rights.  However, the Court notes that Defendant cited no authority for the
proposition that a written waiver is required and the Court is not aware of any such authority.

deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" with respect to the postwarning confession. *Id*. at 314.  Rather, "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Id*. at 308.  The Supreme Court held that a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id* at 318. Accordingly, if the pre-warning statement was voluntary, then the post-warning confession is admissible, unless it was involuntarily made despite the *Miranda* warning.  *See United States v. Wauneka*, 770 F.2d 1434, 1440 (9th Cir. 1985).

Subsequently, the Ninth Circuit held that a court must suppress post-warning confessions obtained during a deliberate two-step interrogation where, in light of the objective facts and circumstances, the midstream *Miranda* warning did not effectively apprise the suspect of his rights. *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006).[7]  Here, Detective Orth testified that he was not aware of the prior request that Defendant made to obtain a lawyer and did not confront Defendant with the incriminating information obtained by Officer Dewreede.  There is no evidence to suggest that the statements made to Officer Dewreede were coerced or involuntary in any way. Accordingly, the Court finds that there was no deliberate two-step interrogation and the *Miranda* warning issued by Detective Orth effectively apprised Defendant of his rights.  As a result, the Court finds that Defendant was subjected to a custodial interrogation by Detective Orth and properly advised of his *Miranda* rights prior to making a statement.

### 5.   Voluntary

Defendant testified that he made statements to Detective Orth because he was led to believe

---

[7] The Supreme Court's belief that *Elstad's* prewarning statements were voluntary played a decisive role in its analysis.  It reasoned that where a properly warned confession was preceded by a "clearly voluntary" but unwarned statement, a "careful and thorough" midstream warning ordinarily should suffice to remove the conditions that precluded admission of the earlier statement because it "conveys the relevant information" regarding a suspect's Fifth Amendment rights.  470 U.S. at 310-11.  In such circumstances, "the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will." *Id*. at 311.

he would be released if he discussed his involvement in the incident.  The Court construes this
testimony as an argument that the statements made were involuntary.  A confession is involuntary
if coerced either by physical intimidation or psychological pressure.  *See United States v. Haswood,*
350 F.3d 1024, 1027 (9th Cir. 2003).  In determining whether a defendant's confession was
voluntary, "the question is 'whether the defendant's will was overborne at the time he confessed.'"
*Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir. 2003); *see also Henry v. Kernan,* 197 F.3d 1021,
1026-1027 (9th Cir. 1999) (the test of voluntariness is well established: "Is the confession the
product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is
that at which governing self-direction is lost and compulsion, of whatever nature or however
infused, propels or helps to propel the confession.").  Psychological coercion invokes no per se
rule.  *See United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993).  The Court must consider
the totality of the circumstances involved and their effect on the will of the defendant.  *See United
States v. Crawford*, 372 F.3d 1048, 1061 (9th Cir. 2004).

Moreover, the Ninth Circuit has acknowledged that law enforcement officers commonly
engage in deceptive tactics when conducting interviews, but have found that "trickery is not
automatically coercion."  *Id.*  Indeed, law enforcement officers often suggest to a suspect that a
confederate has just confessed or that police have or will secure physical evidence against the
suspect.  *See, e.g., Frazier v. Cupp*, 394 U.S. 731, 737-739 (1969) (holding that confession was
voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to
the crime); *United States v. Orso*, 266 F.3d 1030, 1039 (9th Cir. 2001) (holding that an inspector's
misrepresentation that a piece of evidence existed, while reprehensible, does not constitute coercive
conduct); *Clanton v. Cooper*, 129 F.3d 1147, 1158 (10th Cir. 1997) (holding that a confession was
voluntary despite the fact that an officer falsely told the defendant that physical evidence connected
him to the crime).  Accordingly, insisting that a witness tell the truth or warning a witness that a
false statement to a federal law enforcement agent carries a criminal penalty does not automatically
make a subsequent statement involuntary.

Here, Defendant previously raised his desire for an attorney and to remain silent with
Officer Dewreede before he was administered his *Miranda* rights.  He testified that he was

12

previously aware of his *Miranda* rights from prior police encounters.  By deciding to make statements to Detective Orth after receiving a formal *Miranda* warning, the Court finds that Defendant voluntarily exercised his unconstrained choice to discuss the incident.  This was a choice which the Defendant made voluntarily and not the result of his will being overborne.  Accordingly, the Court will recommend that the statements made by Defendant to Detective Orth should not be suppressed.

### 6.    DNA Sample

Relatedly, Defendant contends that the DNA sample he provided on November 17, 2012 should be suppressed.  Given that the Court finds that he was adequately advised of his *Miranda* rights by Detective Orth, the Court finds that the DNA sample should not be suppressed as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471 (1963).  It was not an exploitation of the prior statements to Officer Dewreede and the *Miranda* warning advisement by Detective Orth is a sufficient intervening event to purge any taint.  In addition, Defendant provided a written consent to Detective Orth for the DNA sample.  *See* Govt. Ex. 2 DNA Collection Form.  Defendant alleges that he signed the consent form without reading because he thought he would be released.  The Court finds that his consent was not coerced.  Therefore, the Court will not recommend that the DNA buccal swab seizure from November 17, 2012 be suppressed.

### B.    Count Two: February 16, 2013

As to the incident on February 16, 2013, Defendant argues that even if the officers had probable cause to detain him to locate Pratti, it ceased when they learned that she was not in the vehicle.  As a result, Defendant claims that it was illegal to further detain him to obtain the insurance documents for the vehicle because that was unrelated to the original reason for the stop.  Additionally, Defendant argues that when Officer Corry entered the vehicle to obtain the insurance documents, he conducted an illegal search of the vehicle and the results of that search should be suppressed.  He argues that the Government can provide no documentary evidence that Defendant consented to the search.  In the alternative, assuming consent, Defendant argues that the search was beyond the scope of the consent, which was limited to the glove compartment.  Finally, Defendant argues that Aguilera's statements should be suppressed as fruit of the illegal search.

1    In response, the Government argues that Defendant has no standing to object to the search

2    of the vehicle.  It alleges that there was reasonable suspicion to justify the vehicle stop based on the

3    records check result.  The Government also claims that other reasonable traffic-stop activities may

4    be taken as long as the traffic stop itself was valid.  Further, the Government contends that

5    Defendant consented to Officer Corry's search of the glove compartment to obtain the insurance

6    documents.  Additionally, the Government argues that Aguilera's statements were voluntary and

7    Defendant lacks standing to request their suppression.

8                                    **1.     Standing**

9    It is axiomatic that an individual seeking to exclude evidence allegedly obtained in violation

10   of the Fourth Amendment must have standing to challenge the illegal conduct that led to the

11   discovery of the evidence.  *United States v. Pulliam*, 405 F.3d 782, 785-786 (9th Cir. 2005) (*citing*

12   *Rakas v. Illinois*, 439 U.S. 128, 134 (1978)) (finding defendant did not have standing to challenge

13   the search of a car in which he was a passenger and seizure of the gun found in the car did not

14   violate his Fourth Amendment rights).  The proponent of a motion to suppress has the burden of

15   establishing that his Fourth Amendment rights were violated by the challenged search or seizure.

16   *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted) (finding defendant

17   failed to show he had reasonable expectation of privacy in laptop seized by police).  "To invoke the

18   protections of the Fourth Amendment, a person must show he had a 'legitimate expectation of

19   privacy.'"  *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000).  To establish a legitimate

20   expectation of privacy a person must show: (1) a subjective expectation of privacy that (2) society

21   is prepared to recognize as objectively reasonable.  *Id.* (*quoting Smith v. Maryland*, 442 U.S. 735

22   (1979)).  Generally, a person does not have a legitimate expectation of privacy in another's

23   property.  "A person who is aggrieved by an illegal search and seizure only through the introduction

24   of damaging evidence secured by a search of a third person's premises or property has not had any

25   of his Fourth Amendment rights infringed."  *Rakas*, 439 U.S. at 134.

26   As a general matter, a person does not possess a reasonable expectation of privacy in a

27   vehicle in which he has no lawful ownership or possessory interest.  *See id.* at 148-49 (noting a

28   passenger who asserts neither a possessory nor property interest in a vehicle does not have a

1   legitimate expectation of privacy in the vehicle); *see also United States v. Thomas*, 447 F.3d 1191,

2   1197 (9th Cir. 2006) (finding an unauthorized driver has no privacy interest in a rental car).

3   However, "possessory or ownership interests" are not narrowly defined. *Thomas*, 447 F.3d at 1197.

4    "A reasonable expectation of privacy may be shown 'either by reference to concepts of real or

5   personal property law or to understandings that are recognized and permitted by society.'" *Id*.

6   (*quoting Rakas*, 439 U.S. at 142 n. 12). Thus, even though a defendant may lack an ownership

7   interest, he may have standing to challenge a search upon showing "joint control" or "common

8   authority." *Id*. at 1198. The Ninth Circuit has defined common authority as "mutual use of the

9   property by persons generally having joint access or control for most purposes." *Thomas*, 447 F.3d

10  at 1198 (*quoting Illinois v. Rodriguez*, 497 U.S. 177 (1990)). For example, in *United States v.*

11  *Portillo*, 633 F.2d 1313, 1317 (9th Cir. 1980), the Ninth Circuit held that the defendant who was

12  driving the vehicle with the owner's permission had standing to challenge the propriety of the

13  search of the trunk.

14         Here, the Court finds that Defendant has standing to challenge the search of the vehicle.

15  Defendant had a possessory interest in the vehicle because he had permission from the vehicle's

16  owner, Pratti, to drive it. Indeed, Pratti testified that Defendant had permission to drive the vehicle

17  for the entire month of February, that he had his own key, and that he maintained the vehicle. With

18  such "joint control" or "common authority," the Court finds that Defendant had a reasonable

19  expectation of privacy that would permit his Fourth Amendment challenge to a search of the car.

20  *Thomas*, 447 F.3d at 1198.

21         On the other hand, the Court finds that Defendant lacks standing to challenge the

22  voluntariness of Aguilera's statements. Officer Cannon testified that she interviewed Aguilera on

23  February 16, 2013 in which Aguilera informed her that Aguilera met Defendant earlier that

24  evening. Officer Cannon further testified that Aguilera told her that she observed Defendant show

25  a black firearm to an unknown black male earlier that evening, that Defendant told Aguilera it was

26  a BB gun, but she recognized it as an actual firearm. No testimony or evidence was introduced to

27  contradict Officer Cannon's testimony that Aguilera completed a voluntary statement and

28  consented to a DNA buccal swab seizure. Further, to the extent that Defendant request suppression

15

of Aguilera's statements as fruit of the poisonous tree, the Court finds that such remedy is not warranted.  Defendant failed to establish that he has standing to challenge a potential violation of Aguilera's Fourth and Fifth Amendments rights.  Moreover, as will be discussed below, the Court finds that an illegal search did not occur so Aguilera's statements would not be considered fruit of the poisonous tree.

### 2.    Detention

The Supreme Court has long held that law enforcement officers may confront a citizen at any time, ask for identification and other information, and even request permission to search so long as a reasonable person in the citizen's position would recognize that he or she is free to leave or terminate the encounter.  *See, e.g., Terry v. Ohio*, 392 U.S. 1 (1968); *Florida v. Royer*, 460 U.S. 491 (1983); *Florida v. Rodriguez*, 469 U.S. 1 (1984).  Indeed, law enforcement officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions because "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

An investigatory detention under the Fourth Amendment must be supported by "reasonable suspicion" that criminal activity may be afoot. *Terry*, 392 U.S. 1; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002).  In assessing whether an officer has reasonable suspicion to conduct an investigatory detention, reviewing courts look at the "totality of the circumstances" of each case to see whether the detaining officer had a "particularized and objective basis" for suspecting legal wrongdoing. *Id.* "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Sigmond-Ballasteros*, 285 F.3d 1117, 1121 (9th Cir. 2002) (citing *Arvizu*, 534 U.S. at 273).

Additionally, an investigatory detention "must be carefully tailored to its underlying justification . . . and may last no longer than is necessary to effectuate the purpose of the stop." *United States v. Chavez–Valenzuela*, 268 F.3d 719, 724 (9th Cir.2001) (*quoting Royer*, 460 U.S. at 500).  Initially, an officer must restrict the questions he asks to those reasonably related to the justification for the stop. *See United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001)

1    (overruled on other grounds by *United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007)).  An officer

2    may expand the scope of questioning only if he notices particularized, objective factors arousing his

3    suspicion.  *See United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir.2002).

4         Here, Officers Corry and Cannon testified that Defendant was parked at a gas pump when

5    they pulled up behind him.  Before they activated any emergency lights or siren, Defendant exited

6    the driver's seat and asked why he was being stopped.  Contrary to Defendant's assertion, the Court

7    finds that Defendant was not seized at this point.  As noted previously, Defendant initiated

8    questioning with the officers, he was not subject to any restraint or coercive tactics, and the officers

9    did not have their emergency lights or siren activated or make any other exaggerated displays of

10   authority.  Accordingly, Defendant was subject to a proper investigatory detention under the Fourth

11   Amendment.  At this point in the officers' interaction with Defendant, they had reasonable

12   suspicion to stop and question Defendant and the female occupant of the vehicle based on the

13   outstanding warrant for Pratti, the vehicle's owner.  It was reasonable to require Aguilera to

14   establish her identity as part of the investigatory stop regarding Pratti's warrant.

15        It was also reasonable to question Defendant regarding his control of the vehicle.

16   Furthermore, the officers identified particularized, objective factors that supported reasonable

17   suspicion and justified extending the stop after determining Aguilera's identity and the knowledge

18   volunteered by Defendant.  First, Defendant was unable to establish that he had permission to drive

19   Pratti's vehicle.  Second, Defendant's criminal history included an arrest for possession of a stolen

20   vehicle.  Third, the area of the stop was considered by the officers to be a high crime area.

21   Accordingly, although the vehicle was not reported as stolen, it was reasonable to determine

22   whether Defendant had permission to drive it and it was properly registered and insured.  *See*

23   *United States v. Flores*, 359 F. Supp. 2d 871, 879 (D. Ariz. 2005) ("so long as the traffic stop itself

24   is made on a valid basis, otherwise reasonable traffic-stop activities may be undertaken with a view

25   toward detecting additional evidence of a crime without running afoul of constitutional

26   limitations"); *see also United States v. Hickman*, 523 F.2d 332, 327 (9th Cir. 1975) (allowing

27   questioning about the ownership of the boat).  Contrary to Defendant's argument, the fact that

28   Pratti was not in the vehicle did not make the subsequent brief detention to determine the insured

1   status of the vehicle violative of the Fourth Amendment.  It was reasonably related to determining

2   where Pratti was and if Defendant had permission to use her vehicle.  Therefore, the Court finds

3   that Defendant's detention while determining the identity of Aguilera and requesting insurance

4   documents was based on reasonable suspicion as required by the Fourth Amendment.

5               **3.    Consent**

6        It is well settled that a warrantless search conducted pursuant to "a valid consent is

7   constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).[8]  Whether a

8   consent to search is voluntary is determined based on the totality of circumstances surrounding the

9   giving of consent.  *United States v. Alfonso*, 759 F.2d 728, 740 (9th Cir. 1985).  The Ninth Circuit

10  has identified five, non-dispositive factors to consider when determining whether a consent is

11  voluntary including: (1) whether the defendant was in custody; (2) whether the arresting officer had

12  his gun drawn; (3) whether *Miranda* warnings had been given; (4) whether the defendant was told

13  he has a right not to consent; and (5) whether the defendant was told a search warrant could be

14  obtained.  *United States v. Patayan-Soriano*, 361 F.3d 494, 502 (9th Cir. 2004) (*citing United*

15  *States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1988)).

16       Officer Corry testified that after he determined that Defendant had a significant criminal

17  background, the interest of officer safety motivated him to ask Defendant for permission to look in

18  the glove box for the insurance documents rather than to allow Defendant to re-enter the vehicle.

19  He testified that Defendant voluntarily consented to allow him to look in the glove box.  Officer

20  Cannon's testimony confirmed that Officer Corry asked for and Defendant gave his permission to

21  look in the glove compartment for the insurance papers.  In contrast, Defendant testified that he did

22  not give consent for Officer Corry to retrieve the insurance documents.  In addition, Defendant

23  underscores the fact that the officers did not obtain a written consent form.  However, execution of

24  a consent form is just one factor that indicates that consent was voluntary; it does not prevent an

25  oral consent from being valid.  *See Castillo*, 866 F.2d at 1082.  Here, no *Miranda* warnings were

26  ───────────────

27  　　[8] Defendant claims that he never consented and submits no argument regarding
    voluntariness.  Given the testimonial discrepancies between Defendant and the officers, the Court
28  will address the Ninth Circuit voluntariness factors.

                                          18

1    issued because Defendant was not under arrest, Defendant was not in custody, the officers did not

2    have their weapons drawn, although there was no indication that Defendant was told he had the

3    right not to consent or a search warrant could be obtained.  After careful consideration, the Court

4    finds that the testimony of Officers Corry and Cannon that Defendant voluntarily consented to the

5    search to be more believable.  Unlike Defendant, both Officers had a clear recollection of the

6    chronology of events and testified consistently.[9]  Accordingly, the Court finds that Defendant

7    voluntarily consented to allow Officer Corry to look for insurance papers in the glove box.

8                                **4.    Plain View**

9           Incriminating evidence in plain view can be seized if the officer does not violate the Fourth

10   Amendment in arriving at the place from which the evidence could be plainly viewed.  *Horton v.*

11   *California*, 496 U.S. 128, 136 (1990) (noting plain view often arises when police search a given

12   area for specified objects and come across some other article of incriminating character); *see also*,

13   *U.S. v. Stafford*, 416 F.3d 1068, 1076 (9th Cir. 2005) ("To fall within the plain view exception, two

14   requirements must be met: the officers must be lawfully searching the area where the evidence is

15   found and the incriminatory nature of the evidence must be immediately apparent."); *United States*

16   *v. Head*, 783 F.2d 1422 (9th Cir. 1986) (finding the agents' conduct in inspecting the interior of the

17   van by peering through the window did not violate the Fourth Amendment).  Significantly, plain

18   view requires the officer to have a prior justification for an intrusion during which a piece of

19   evidence is inadvertently found.  *See Horton*, 496 U.S. at 135.

20          Officer Corry testified that when he leaned into the vehicle to look into the glove box, he

21   noticed the barrel of a firearm beneath the passenger seat.  He immediately stopped his search for

22   the insurance documents and advised Officer Cannon, using code "413," that he had seen a

23   weapon.  The officers requested assistance from the FIU in order to obtain a search warrant.

24   Officer Corry testified that he could not tell the make of the pistol, but could tell that it was a 9

25   millimeter pistol based upon his training and experience.  He also testified that he did not touch the

26   _____

27          [9] Defendant's testimony was so contradictory as compared to the Government's witnesses
     that he even denied the identity of the passenger of the car on February 16, 2013 despite the
28   officers verifying her identity as Aguilera.

1    pistol.  According to the photograph of the pistol under the seat, the barrel is easily discernable.

2    (Evid. Hr'g Mar. 17, 2014, Def.'s Ex. D-8.)

3          The Court finds that both requirements of the plain view doctrine are met.  First, the Court

4    finds that Officer Corry was lawfully looking into the vehicle to open the glove box to retrieve the

5    insurance documents.  As previously determined, Defendant provided his voluntary consent for

6    Officer Corry to look for insurance documents in the vehicle's glove box.  Second, the

7    incriminating nature of the evidence was immediately apparent to Officer Corry because he had

8    previously obtained Defendant's criminal history, knew that Defendant was a convicted felon, and

9    therefore, unable to possess a firearm.  Officer Corry testified that the area was well lit and he could

10   see the barrel easily.  Based upon his training and experience, he was capable and competent to

11   recognize the pistol barrel.  Accordingly, the plain view doctrine would have permitted Officer

12   Corry to seize the pistol at the moment he observed it.

13         The Court admitted a copy of the search warrant obtained by Detective Orth after his arrival

14   on scene and briefing as to Officer Corry's discovery.  (Evid. Hr'g Mar. 17, 2014, Def.'s Ex E-1.)

15   The search warrant approves the seizure of firearms, "to include but not limited to a Berretta 9mm

16   s/a[10] pistol."  *Id.*  Neither the application for the search warrant nor the affidavit in support of the

17   search warrant were introduced into evidence, but the search warrant indicates that the affidavit

18   was provided by Detective Orth.  Defendant attacks the specificity of the warrant to support his

19   contention that Officer Corry illegally searched the vehicle prior to Detective Orth obtaining the

20   warrant.  First, Defendant argues that it would have been impossible for Officer Corry to know that

21   the pistol was a Berretta 9 millimeter pistol given its location under the passenger seat unless he

22   viewed it during a prior illegal search.  Defendant also argues that even if he provided consent to

23   search the glove box for insurance documents, Officer Corry exceeded the scope because his

24   viewpoint would not allow him to see the barrel when looking at the glove box.  Similarly,

25   Defendant highlights the fact that the warrant authorized the seizure of narcotics paraphernalia

26   including "but not limited to a glass smoking pipe commonly used to ingest methamphetamine."

27   _____

28          [10] The Court assumes this means "semi-automatic."

20

(Evid. Hr'g Mar. 17, 2014, Def.'s Ex. E-1). Because there is no evidence to indicate that a glass smoking pipe was observed in the vehicle prior to the search warrant being executed, Defendant asserts that Officer Corry must have already performed an illegal search.[11] The Court is not convinced that Officer Corry performed an illegal search prior to Detective Orth obtaining a search warrant or that Officer Corry exceeded the scope of Defendant's consent to search the glove box. The angle of the picture admitted as Defendant's Exhibit D-8 indicates that the barrel of the pistol is sticking out underneath the seat. It is unclear how far the barrel sticks out when observed from a viewpoint looking down into the car. The Court finds Officer Corry's testimony credible that he went to search for insurance documents in the glove box with Defendant's consent and saw the barrel in plain view. Further, the Court finds credible Officer Corry's explanation that his training and experience informed his knowledge of the type of firearm involved and he is able to recognize such a firearm at all angles. Accordingly, the seizure of the firearm did not violate Defendant's Fourth Amendment rights and the Court will not recommend suppression of the firearm seized on February 17, 2013.[12]

### 5. Lost Dash Cam Recording

Due process requires that criminal prosecutions "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). The Government must afford a criminal defendant "a meaningful opportunity to present a complete defense," which

---

[11] Because the instant motions address only felon in possession charges and Defendant is not charged with an offense related to narcotics possession , the Court will not analyze the propriety of the seizure of two pipes and a clear plastic bag containing methamphetamine. Further, Defendant did not challenge the sufficiency of the search warrant affidavit pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Accordingly, the Court will not address the narcotics-related evidence seized pursuant to the search warrant subsequent to Officer Corry's plain view discovery of the firearm.

[12] Defendant also suggests, without providing any authority, that Aguilera's statements should be suppressed as fruit of the poisonous tree. Because the Court finds that the vehicle stop was based upon reasonable suspicion, the search of the glove box was based upon consent, and plain view authorized the seizure of the firearm, it will not recommend that Aguilera's statements be suppressed as fruit of the poisonous tree.

1    requires that it must provide an accused with exculpatory evidence.  *Id.*  There is a duty to preserve

2    evidence "that might be expected to play a significant role in the suspect's defense," such as,

3    "evidence that both possess[es] an exculpatory value that was apparent before the evidence was

4    destroyed, and . . . [is] of such a nature that the defendant would be unable to obtain comparable

5    evidence by other reasonably available means."  *Id.* at 489.

6         The "mere possibility" that the lost or destroyed evidence is exculpatory does not meet the

7    materiality standard.  *United States v. Agurs*, 427 U.S. 97, 110-111 (1976).  Evidence is material

8    only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

9    result of the proceeding would have been different.  *Id.*  A "reasonable probability" is a probability

10   sufficient to undermine confidence in the outcome.  *United States v. Bagley*, 473 U.S. 667, 682

11   (1985).  Moreover, as the Supreme Court held in *Arizona v. Youngblood*, 488 U.S. 51 (1988),

12   unless a criminal defendant can show bad faith on the part of the police, failure to preserve

13   potentially useful evidence does not constitute a denial of due process of law.  *See also,*

14   *Featherstone v. Estelle*, 948 F.2d 1497, 1504 (9th Cir. 1991) (destruction of photo lineup not a

15   denial of due process).

16        Citing *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993), Defendant raises a new

17   argument post-evidentiary hearing that the Government's failure to preserve video from a dash

18   camera on Officer Corry's marked unit constitutes a violation of Defendant's due process rights.

19   He contends that such video evidence would have supported Defendant's claim that he did not

20   consent to the glove box search and any warrantless entries by the officers into the vehicle.

21   However, Defendant clarifies that he is not alleging direct prosecutorial misconduct, but requests

22   suppression as the remedy for the lost evidence.

23        The Government responds that the failure to preserve potentially useful evidence does not

24   violate due process unless a criminal defendant can show bad faith on the part of the police.  It

25   counters Defendant's assertion by claiming that the dash camera was provided by a private

26   company on a temporary, test-run basis.  As a result, the camera and recordings were returned to

27   the private company at the conclusion of the test.  Therefore, the Government claims there is no

28   misconduct or bad faith on the part of LVMPD because if a dash camera recording ever existed, it

1     is not in the custody of the Government and was not destroyed to prevent Defendant from having

2     potentially useful evidence.

3          The Court finds that Defendant has failed to state a due process violation regarding the

4     possible destruction of a dash camera recording. Officer Corry testified that he was uncertain

5     whether a recording of the incident ever existed or whether the dash cam was operating on that

6     night. Officer Cannon confirmed that the equipment and recordings were not retained by LVMPD

7     and the materials were returned to the private company. Both Officer Corry and Officer Cannon

8     testified that they did not review the dash camera to see if a recording was made or its contents.

9     Assuming, *arguendo*, that a video existed and it would have been potentially useful to Defendant to

10     demonstrate that he did not consent to the search of the glove box, the Court finds that Defendant

11     has failed to demonstrate a bad faith failure to preserve the evidence by the Government. To the

12     contrary, it appears that if the evidence existed, it was not in the possession of LVMPD because it

13     was a temporary test. As such, the recordings were not retained in the ordinary course of business

14     of LVMPD because they belonged to the private company. Accordingly, the Court concludes that

15     Defendant's due process argument lacks sufficient evidentiary foundation to find bad faith by the

16     Government and his request for a suppression remedy is denied.

17          Based on the foregoing and good cause appearing therefore,

18                     **RECOMMENDATION**

19       **IT IS HEREBY RECOMMENDED** that Defendant Francisco Alcaraz's Motion to

20     Suppress (#43) be **granted in part and denied in part**.

21       **IT IS FURTHER RECOMMENDED** Defendant Francisco Alcaraz's Motion to Suppress

22     (#43) be granted only as to his statements to Officer Dewreede on November 17, 2012.

23                         **NOTICE**

24          Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be

25     in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has

26     held that the courts of appeal may determine that an appeal has been waived due to the failure to

27     file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit

28     has also held that (1) failure to file objections within the specified time and (2) failure to properly

address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

      DATED this 3rd day of June, 2014.

 

 

                                _____

                                **C.W. Hoffman, Jr.**
                                **United States Magistrate Judge**